Memorandum of Decision
On October 30, 1998, the Department of Children and Families (DCF) filed a petition alleging that Michelle G. was neglected in that her guardian and maternal grandmother, Patricia B., denied Michelle proper care and attention, physically, educationally, emotionally, and morally, and permitted Michelle to live under conditions, circumstances or associations injurious to her well-being. See General Statutes §§ 46b-120(8)(B) and (C). The court entered an order of temporary custody at that time. On December 15, 1998, the maternal grandmother filed a motion to vacate the order of temporary custody. A consolidated trial of the neglect petition and hearing on the motion took place on June 3 and 10, 1999. At the conclusion of the trial, the court adjudicated Michelle neglected on both alleged grounds, although it found that Michelle had been denied proper care and attention only in the emotional sense, and reserved decision on the disposition. For the reasons stated below, the court now orders Michelle committed to DCF for a period of one year and denies the motion to vacate the order of temporary custody.
DISCUSSION
In the dispositional phase, the court may consider events occurring through the close of the evidentiary hearing. Practice CT Page 6631 Book § 33-5. DCF retains the burden of proof by a fair preponderance of the evidence based on the best interest of the child. Practice Book § 33-12.[2]
The maternal grandmother, Patricia B., has a troubling past record of criminal convictions and neglect of children. Although in recent years the maternal grandmother has not been convicted of or, apparently, arrested for, any criminal activity, the court nonetheless does not believe that the maternal grandmother currently possesses the judgment and temperament that would make it in Michelle's best interest to return to the maternal grandmother's custody. Two DCF workers found the maternal grandmother difficult to work with and uncooperative. The maternal grandmother would not, for instance, provide her new telephone number to DCF. Dr. Robert Neems, the court-appointed evaluator, also found the maternal grandmother to have problems with authority figures, difficulty controlling her temper, and impulsive judgment. The prime example of her poor judgment, of course, is her decision to resume a relationship with Archibald F., marry him, and bring him into her home with her daughter Chrisma and granddaughter Michelle, even though he had been convicted of sexually assaulting her, violating a protective order imposed for her protection, committing an assault against a third person, and violating his probation. The end result was that Mr. F. attempted to sexually assault Chrisma, then sixteen years old, while Michelle was living in the same house.
Although the maternal grandmother did not feel that Dr. Neems conducted a fair evaluation, the fact of the matter is that the maternal grandmother was less than honest during that evaluation. As early as December 7, 1998, the maternal grandmother acknowledged in her motion to vacate that the sexual assault was "perpetrated by Archibald F. on Chrisma." The maternal grandmother testified at trial that, while she did not know what to believe at the time of the incident, she believes Chrisma's allegations now. Yet during the March 1, 1999 evaluation, the maternal grandmother expressed skepticism of her daughter's story and suggested that Chrisma had reasons to make it up. The maternal grandmother also told Dr. Neems that she had not seen Mr. F since October, 1998. She testified at trial, however, that she last saw him in February, 1999, no more than one month before the evaluation.[3]
Michelle, who was placed with her maternal grandmother at birth because Michelle and her mother, LaToya G., tested positive CT Page 6632 for illegal drugs, has been oppositional and hyperactive during her childhood. While such a child would undoubtedly be difficult for any parent or guardian to raise, some of Michelle's difficulties appear to stem from the maternal grandmother's ineffectiveness in setting limits. Michelle also developed her sexualized behaviors while in the maternal grandmother's care, probably due to exposure to sexual behavior by men living in the household. Michelle is now in a foster home that is meeting her specialized needs by providing a highly structured environment. In this new foster home, Michelle is reportedly happy, calmer, and less anxious. Her best interest warrants that she remain in foster care for the time being.
The maternal grandmother and the mother suggested as an alternative to nonrelative foster care that the court order DCF to place Michelle in the custody of Karen R., the maternal great aunt. There is some merit to this suggestion. The maternal great aunt is gainfully employed, stable, and mature. Michelle was in the maternal great aunt's custody from November, 1998 to March, 1999, the maternal great aunt's care taking on the whole was good, and placement of Michelle with the maternal great aunt would allow for more visitation by the maternal grandmother, Chrisma, and other family members with whom Michelle is close.
There are, however, some concerns with this placement. In February, 1999, the maternal great aunt went on a previously scheduled trip to Florida and had Michelle placed in respite care for about ten days. The maternal great aunt testified that, since the time Michelle had come back from respite care, her behavior had changed, apparently for the worse. The maternal great aunt bears some responsibility for any problems that developed during this time period because it was her decision to place Michelle in respite care or to travel without Michelle, which she admitted she probably did not have to do. Sometimes being a parent means either taking your children with you on vacation or not taking the vacation at all. In addition, there is an ongoing investigation by DCF of whether the maternal great aunt failed to protect Michelle and Frederick E., another of LaToya's children in the maternal great aunt's custody, because of the allegation that the maternal great aunt allowed Michelle to have contact recently with Archibald F. See note 3 supra. In view of these concerns, the court will not order Michelle returned to the maternal great aunt at this time. The court requests DCF to complete its investigation of the situation promptly and, if the result is favorable to the maternal great aunt, to give her fair CT Page 6633 and serious consideration as a placement resource who is within the biological family.
CONCLUSION
For the foregoing reasons, the court orders Michelle committed to the custody of DCF for a period of one year. The court directs DCF to submit proposed specific steps for approval that would further DCF's stated goal of reunification of Michelle with her maternal grandmother. If DCF desires to pursue possible reunification with the mother and seeks approval of specific steps toward that end, one of those specific steps shall be that the mother shall cooperate fully in identifying Michelle's father, who to this day remains unknown to DCF and the court.
It is so ordered.
Carl J. Schuman, Judge Superior Court